Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4603 | **DATE** | 1/11/2001 |
| **CASE TITLE** | Wootten vs. Fortune Brands, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Defendants' motion for summary judgment [35] is denied. Enter Memorandum Opinion and Order. Status hearing and motion of Rowe W. Snider for relief from appointment as pro bono counsel [33] is set for 2/1/01 at 10:00 a.m. Pretrial materials due by 8/31/01. Pretrial conference set for 9/21/01 at 3:30 p.m. Trial set for 10/01/01 at 10:00 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JAN 22 2001 | |
| | Notified counsel by telephone. | | date docketed | 58 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| MD | courtroom deputy's initials | 01 JAN 19 PM 3:30 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MARTHA A. WOOTTEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 98 C 4603 |
| ) | |
| FORTUNE BRANDS, INC., ACCO, ) | |
| WORLD CORPORATIONS, ACCO ) | **DOCKETED** |
| BRANDS OFFICE PRODUCTS, INC., ) | |
| DAVID COHRS, and KEVIN OWENS, ) | JAN 2 2 2001 |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff's seven-count amended complaint alleges violation of Title VII of the Civil Rights Act of 1964 as well as various state law claims. Count I is for sexual harassment, count II is for retaliation, count III is for breach of contract, count IV is for tortious interference with contract, count V is for tortious interference with prospective economic advantage, count VI is for infliction of emotional distress, and count VII is for battery. Defendants have moved for summary judgment on all seven counts of Plaintiff's amended complaint. For the reasons articulated below, the court denies Defendants' motion.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and



affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.*, 477 U.S. at 324, 106 S. Ct. at 2553; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

## FACTS

Defendant ACCO World Corporation is a wholly-owned subsidiary of defendant Fortune Brands, Inc., and defendant ACCO Brands, Inc. is a wholly-owned subsidiary of ACCO World Corporation. Plaintiff began working as an administrative assistant for defendant Fortune Brands, Inc., a Delaware corporation doing business in Illinois, in 1995. In February, 1997, Plaintiff transferred to ACCO Brands, Inc. ("ACCO") and began working as the Registrar of ACCO University, a training center for ACCO employees. From February, 1997 until September, 1997, Plaintiff reported directly to Valeria Stokes ("Stokes"). From September, 1997 until November, 1997, Plaintiff reported to defendant David Cohrs ("Cohrs"), who, in turn, reported to Stokes.

Plaintiff claims that during her employment and despite her complaints, she was sexually harassed by both Cohrs and another employee, Kevin Owens ("Owens"). Plaintiff claims that Cohrs began sexually harassing her in March, 1997, and that Owens began sexually harassing her in July or August, 1997. Plaintiff's version of the events are as follows: Cohrs twice kissed her on the cheek. The first time Cohrs kissed her, he put his hands on her arms, pulled her to him, and encircled her with his arms. Even though Plaintiff pushed Cohrs away and told him she did not want him to touch her, Cohrs continued to hug her and kissed her on the cheek on another occasion. In addition, Cohrs would lean over Plaintiff and breathe down her neck while looking at her computer terminal. When Cohrs engaged in this behavior, Plaintiff asked Cohrs to stop and would get up and walk away. Cohrs also made sexual jokes in Plaintiff's presence and inappropriately referred to women's body parts. Owens engaged in similar behavior by hugging Plaintiff up to twenty times while they worked together, at times running his hands down her back as they hugged, and inappropriately speaking about women's body parts and sexual acts in Plaintiffs' presence. Cohrs and Owens essentially deny all of Plaintiff's sexual harassment allegations.

ACCO's sexual harassment policy did not require that sexual harassment complaints be in writing, and Plaintiff claims that she reported or attempted to report the alleged sexual harassment on various occasions as follows. Plaintiff left Stokes a voice mail message in August, 1997, stating that she needed to speak with her about problems with Cohrs but did not mention that she had concerns of a sexual nature. Thereafter, Stokes left Plaintiff a return voice mail stating that Plaintiff should resolve her differences directly with Cohrs. Plaintiff again attempted to complain to Stokes over lunch in September, 1997, but Stokes interrupted Plaintiff

when she started to speak about Cohrs leaning over her while she sat at her computer and told Plaintiff to work directly with Cohrs to resolve her issues. Plaintiff also spoke with ACCO Vice President and Controller Marilee Fraser about Cohrs' alleged sexual harassment on October 31, 1997. Stokes denies that Plaintiff ever complained to her about sexual harassment but Fraser admits that Plaintiff told her about Cohrs' conduct in October, 1997.

On November 6, 1997, both Plaintiff and Cohrs attended a Program Managers' meeting with other ACCO University employees where Plaintiff stated that other company employees were concerned about the ACCO University team. Later that same day, "Cohrs told Plaintiff that her behavior at the meeting . . . was inappropriate," "that rumors she had heard were not important and that the team was not going to spend time on them." (Pl.'s Statement of Undisputed Facts, ¶ 39.) The parties dispute many of the facts surrounding an encounter that took place the following day. The agree, however, that Plaintiff spoke with Cohrs about taking time off work to attend a funeral on November 8, 1997, that Plaintiff raised her voice and used profanity during the conversation, and that her door closed loudly after the conversation.[1] Cohrs agreed to let Plaintiff take time off work to attend the funeral.

On November 12, 1997, Cohrs asked Plaintiff to meet him on the following day, and Cohrs consulted with Stokes before the November 13 meeting. Plaintiff claims that at the November 13 meeting although negative comments were made about her performance, the

---

[1]Plaintiff testified at her deposition that she used the word "goddamn" once during the conversation, and Cohrs testified that Plaintiff "swore at" him. (Def.'s Statement of Undisputed Facts, Ex. A at 349 and Ex. C at 166.) In addition, Defendants fail to controvert Plaintiff's deposition testimony that although she could not specifically recall Cohrs using profanity, profanity was used in the office. Further, Defendants focus on the fact that Plaintiff testified that her door closed loudly after her conversation with Cohrs, which implies Plaintiff slammed the door. Her deposition testimony reveals, however, that Plaintiff, in response to being asked whether she slammed her door, answered, "I was angry, and I reached for the door and it slipped out of my hand. I did not intentionally slam it." (Id. Ex. A at 353.)

4

meeting was called only to discuss the events of the November 6 Program Managers' meeting and resulted in all parties agreeing to move forward from that point. Cohrs acknowledges stating that they would move forward from that point but claims that the meeting was called to discuss Plaintiff's performance issues.

Plaintiff met with ACCO's Regional Director for Human Resources Christine O'Neill ("O'Neill") on November 14, 1997 and discussed the November 7 incident. Plaintiff claims that she spoke to O'Neill about bringing sexual harassment charges against Cohrs and Owens and that O'Neill ignored the statement, but O'Neill claims that Plaintiff did not say anything at the meeting that led her to believe that Plaintiff was complaining about sexual harassment. In addition, Cohrs sent Plaintiff an e-mail on November 14 stating that he had a "narrative" of the November 13 meeting and wanted to review it with her on the following Thursday morning.

On November 16, Plaintiff wrote a letter to Norm Wesley ("Wesley"), Fortune Brands' President and Chief Executive Officer, stating, among other things, that Plaintiff had "gone through several grueling sessions with Valeria Stokes and David Cohrs, repeatedly documenting that [she was] satisfactorily performing [her] job requirements," that Cohrs stated at the November 13 meeting that "the ACCO University Team does not like [her], [her] style or the way [she] say[s] and do[es] things" and that she is "always trying to control them," that even though Cohrs "agreed [she] was performing [her] job requirements quite satisfactorily, he . . . request[ed] yet another meeting," and asked that O'Neill represent her at the upcoming meeting. (*Id.*, Ex. A, Attach. 9.) The letter also stated that O'Neill had recommended Plaintiff "leave the ACCO University team and look for other employment within ACCO and/or Fortune Brands Home & Office," that because Wesley had recommended Plaintiff for her current position,

Plaintiff felt she owed Wesley an explanation as to why she was leaving, that she again needed Wesley's assistance, and that she was considering taking legal action for sexual harassment. (*Id.*)[2] Wesley received the letter on or about November 18, 1997. Cohrs did not see this letter until after November 20, 1997, but Stokes and Wesley spoke about the letter within one day of Wesley having received the correspondence.

Although the parties dispute whether ACCO promptly investigated Plaintiff's sexual harassment complaint to Wesley, they agree that no ACCO employees were interviewed regarding Plaintiff's complaint until after November 20, 1997, that ACCO never provided Plaintiff with the results of its investigation, and that the only documents pertaining to the

---

[2]Specifically, Plaintiff wrote that her husband was pressing her to leave the company and bring legal action for:

1. A hostile environment in the work place. Some of my teammates who have similar feelings about what is happening tell me that I am constantly the topic of negative conversation; that they know every thing is coming down on me.

2. Sexual harassment. This includes sexual comments made in front of the female employees and even being touched by David Cohrs and Kevin Owens more than once. Both continue to do this even after they attended the same Sensitivity Training session I attended. They have made derogatory remarks about the training. One female employee has requested Kevin never hug her again. Kevin placed his arm around the shoulders of another female in the presence of David Cohrs and Joyce Wietrecki just last week. It appeared to me that it was not well received by the recipient.

3. Personal discrimination. Even after I have repeatedly proven that I am performing my job responsibilities, I have been told by a teammate that Valeria said I would have to perform duties clearly outside the written and approved job description and unique accountabilities I currently have that are completely outside of ACCO University. Valeria has not permitted me to assist Glenda Schultheis regarding Plant Technology Safety and Service in the past when I ask if I should assist Glenda. These are duties that she has repeatedly refused to have me perform for members of the ACCO University team. If I had been treated with dignity and respect by Valeria and some of the members of the ACCO University team, I would have gladly assisted on an ad hoc basis without question. Now I feel I am being punished and abused.

(Id.)

investigation are the handwritten notes of Kent Rose, Fortune Brands' Vice President, Associate General Counsel and Assistant Secretary.

On November 20, 1997, Plaintiff attended a meeting with Cohrs and O'Neill. Prior to the meeting, Cohrs reviewed his narrative of the November 13 meeting and an action plan he had drafted regarding Plaintiff with Stokes and O'Neill.[3] Cohrs handed his narrative and action plan to Plaintiff at the beginning of the meeting and then left Plaintiff alone with O'Neill. After reviewing the plan, Plaintiff informed O'Neill that she did not want to comply with the plan.

---

[3]The Action Plan and two preceding paragraphs in the narrative read:

Recommendation
Internal/External customer and vendor interaction will occur only upon Ms. Wooten's immediate supervisor, David Cohrs' directive for the next 30 days.
Rationale
Demonstrated verbal outbursts to an immediate supervisor is insubordinate behavior and was loud enough to be heard by guests present in the immediate vicinity. This action is necessary to ensure that this communication approach does not interfere with the standard of service excellence to ACCO University internal/external customers and vendors. Therefore, any role-related interaction between the registrar and ACCO University customers and vendors must be monitored for a minimum of 30 days, beginning from the date of signature, with weekly monitoring of behavior for a period not to exceed 90 days.
Action Plan
Ms. Wooton must demonstrate the following:
1.  Appropriate communication without loud verbal outbursts, accusations or name-calling and offensive language *or* non-verbal behavior such as slamming of doors.
2.  Authentic behavior that indicates alignment to agreed upon team guidelines that includes communication that involves measurable description of events, specific names, details and documented situations.
3.  Initiate weekly meetings with immediate team leader to obtain delegated registrar assignments and/or to review previous week outcomes of delegated assignments.
4.  Maintain consistent performance of all delegated accountabilities and assignments at a "meet expectations" rating in addition to completing the participant database using Access by 12/31/97.
Ms. Wooten is subject to immediate termination if there are any further volatile verbal exchanges initiated by Ms. Wooten and directed toward her immediate supervisor or any manager/team leader within ACCO University or Learning or Development OR if there is non-compliance to the action plan. If behavior does not demonstrate consistency in the appropriate communication skills at the end of the 90 day period, then Ms. Wooten will be advised as to her philosophical mis-alignment with ACCO University team mission and/or her unsatisfactory performance with delegated tasks and responsibilities that may result in immediate job termination.

(Defs.' Statement of Unsiputed Facts, Ex. C, Attach. 3 (emphasis in the original).)

Plaintiff also refused to sign the plan. Plaintiff and O'Neill then discussed the option of Plaintiff transferring to another department at ACCO Brands, Inc. or Fortune Brands, but they could locate no openings at either place. Plaintiff and O'Neill additionally spoke about a severance agreement, and O'Neill told Plaintiff that Plaintiff must resign before O'Neill could draft such an agreement. Plaintiff neither signed the severance agreement O'Neill drafted and faxed to Plaintiff's home that evening nor returned to work after November 20. Plaintiff claims that O'Neill told her not to return to work and that Plaintiff understood that she was being terminated. O'Neill, however, claims that she never told Plaintiff that Plaintiff was fired.

Plaintiff filed a sexual harassment charge against Cohrs and Owens with the Equal Employment Opportunity Commission (the "EEOC") in December, 1997. Thereafter, the EEOC issued a Notice of Right to Sue and Plaintiff filed this lawsuit on July 27, 1998.

## DISCUSSION

### A. Sexual Harassment

#### 1. hostile work environment

Plaintiff's allegations in count I seek to prove that she suffered sexual harassment from a hostile work environment, as opposed to *quid pro quo* harassment. Hostile work environment harassment "is the form of sexual discrimination in the terms or conditions of employment that consists of efforts either by coworkers or supervisors to make the workplace intolerable or at least severely and discriminatorily uncongenial to women." *DeClue* v. *Cent. Ill. Light Co.*, 223 F.3d 434, 437 (7th Cir. 2000) (citing *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 752, 118 S.

Ct. 2257, 2264, 141 L. Ed. 2d 633 (1998)).[4] *See also Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998) ("The prohibition of harassment on the basis of sex . . . forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment."). In addition, the court employs both an objective and subjective standard when evaluating Plaintiff's claim. "The work environment cannot be described as 'hostile' for purposes of Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000).

As stated above, most of Plaintiff's allegations concerning her hostile work environment claim are disputed. This court, therefore, cannot determine whether the alleged conduct was severe or pervasive enough to constitute hostile work environment harassment without making material factual determinations, a process prohibited when considering a summary judgment motion. While more severe conduct than that alleged could certainly form the basis of a sexual harassment claim, this court is not persuaded by Defendants' argument that the conduct alleged, if true, is not enough to state such a claim. Defendant conveniently omits Plaintiff's allegations that "[o]n nine to ten separate occasions, Cohrs stood directly behind Ms. Wooten while she sat at her computer and Cohrs breathed down her neck as he looked at her computer terminal" and that Plaintiff repeatedly indicated dislike of this practice. Plaintiff also alleges that, despite her protestations, Cohrs hugged her on ten to twenty separate occasions, and that on one such occasion Cohrs came around behind Plaintiff's desk, put his hands on her arms, pulled Plaintiff

---

[4]*Quid pro quo* harassment involves "efforts (normally by supervisors) to extract sexual favors by threats or promises." *Id.*

9

to him, and then completely encircled Plaintiff with his arms, hugged her, and kissed her on the cheek. Further, Plaintiff alleges that Owens hugged Plaintiff up to twenty times despite her repeated requests that he stop. This allegation cannot be characterized, as Defendants do, as Owens merely hugging Plaintiff on several occasions.

Plaintiff's allegations must be taken as a whole. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283, 118 S. Ct. 2275 (1998) (courts are directed to look "at all the circumstances" when determining "whether an environment is sufficiently hostile") (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1995)). And when considering Plaintiff's hostile work environment claim, the Supreme Court has counseled that "all the circumstances" include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S. Ct at 371; *Hostetler*, 218 F.3d at 806-807 (same); *Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999) (same). Further, "[t]here is no 'magic number' of incidents to establish a hostile environment," *Hostetler*, 218 F.3d at 808, and "[a]lthough less severe acts of harassment must be frequent or part of a pervasive pattern of objectionable behavior in order to rise to an actionable level, 'extremely serious' acts of harassment do not." *Smith*, 189 F.3d at 534.

Plaintiff's allegations amount to more than just a few isolated incidents and, if proven, may constitute sexual harassment. Plaintiff complains of repeated unwanted hugging with, in Owens' case, hands running up and down her back and, in Cohrs' case, him pulling her towards him and kissing her. A reasonable jury could find this behavior, coupled with Plaintiff's allegations of Cohrs breathing down her neck, at least pervasive. *See Hostetler*, 218 F.3d at 808

10

("Harassment need not be severe *and* pervasive to impose liability; one or the other will do.") (emphasis in original); *Smith*, 189 F.3d at 533 ("the Supreme Court has repeatedly said, using the disjunctive 'or,' that a claim of discrimination based on infliction of a hostile working environment exists if the conduct is 'severe or pervasive.'"). Plaintiff also alleged that "every time that Cohrs leaned over her and breathed down her neck, [she] would get up and walk away, even though it was very difficult for her to do so," that "she often felt trapped," and that she "felt frightened of Cohrs." Plaintiff offers evidence, therefore, that not only was Cohr's conduct threatening, but it also unreasonably interfered with her work performance.

Both *Saxon v. Am. Tel. & Tel. Co.*, 10 F.3d 526 (7th Cir. 1993), and *Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705 (7th Cir. 1995), cited by Defendants, are distinguishable. While the Seventh Circuit affirmed the district court's grant of summary judgment for the defendants in both cases, the conduct alleged in these cases was not as pervasive as that alleged by Plaintiff. In *Saxon*, the plaintiff experienced repeated unwanted touching (a hand placed on her leg above the knee) and an unwanted kiss while out at a nightclub with her supervisor, in addition to that same supervisor lurching at her from behind some bushes as if to grab her about three weeks after the nightclub incident. After the lurching incident, when the plaintiff again expressed how inappropriate her supervisor's behavior was, her supervisor stopped making sexual advances but began treating her differently at work. The Seventh Circuit did not believe that this conduct was so severe or pervasive as to constitute sexual harassment. In making that decision, however, the *Saxon* court noted the limited nature of the conduct and essentially found that the conduct boiled down to two incidents. Plaintiff's allegations, while perhaps not persistently severe, taken as a whole amount to something more pervasive than the conduct alleged in *Saxon*. Likewise in

11

*Koelsch*, the plaintiff worked alleged "two separate incidents of sexual harassment in which [the company's president] initiated unwelcome physical contact." 46 F.3d at 706. And again, while the alleged physical contact in *Koelsch* may have been more severe than that presently alleged by Plaintiff (specifically, the company's president rubbed his foot against Koelsch's leg and grab her buttocks), the contact stopped completely after the second incident. Here, despite Plaintiff's requests, Owens' and Cohrs' unwanted touching did not stop.[5]

### 2. the *Ellerth* defense

The Supreme Court explained in two decisions issued the same day, *Burlington Indus., Inc. v. Ellerth* and *Faragher v. City of Boca Raton*, that an employer is vicariously liable to a sexually harassed employee when "a supervisor with immediate (or successively higher) authority" creates "an actionable hostile environment." *Ellerth*, 524 U.S. at 765, 118 S. Ct at 2270; *Faragher*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662. If "the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment," the employer is not entitled to raise an affirmative defense. *Id.*, 524 U.S. at 808, 118 S. Ct. at 2293; *Ellerth*, 524 U.S. at 765, 118 S. Ct at 2270. When there was no tangible employment action, the affirmative defense against liability and damages available to an employer is comprised of two elements and subject to proof by a preponderance of the evidence. *Ellerth*, 524 U.S. at 765, 118 S. Ct. at 2270; *Faragher*, 524 U.S. at 807, 118 S. Ct. at 2293. The "two necessary elements [are]: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the

---

[5] *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333 (7th Cir. 1993) and *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210 (7th Cir. 1986), also cited by Defendants, are distinguishable for the same reasons.

plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765, 118 S. Ct. at 2270; *Faragher*, 524 U.S. at 807, 118 S. Ct. at 2293.

Whether tangible employment action was taken in this case is another fact issue that cannot be resolved on the present motion. First, the parties dispute whether Plaintiff was fired at the November 20 meeting with O'Neill. Plaintiff's termination, if proven, would certainly qualify as a tangible employment action, although whether harassment culminated in the termination is a question of fact as well. Second, even if O'Neill did not terminate Plaintiff's employment, a fact question exists as to whether mandatory placement on the performance plan constituted a tangible employment action culminating from the harassment. As noted by the Seventh Circuit in *Molnar v. Booth*, "the [*Ellerth*] Court highlighted indicia such as 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" 229 F.3d 593, 600 (7th Cir. 2000) (quoting *Ellerth*, 524 U.S. at 761, 118 S. Ct at 2257). The performance plan appears to qualify as "other indices that might be unique to a particular situation" and may have caused "a substantial detriment to the plaintiff's employment relationship." *Savino v. C.P. Hall Co.*, 199 F.3d 925, 932 n.8 (7th Cir. 1999).

The facts of *Molnar* are instructive. In that case, the Seventh Circuit concluded that the plaintiff, an art teacher, established a tangible employment action when her principal confiscated her art supplies and negatively evaluated her. "The mere fact that the evaluation was reversed more than six months later and Molnar's career put back on track does not diminish its

13

importance during the time it lasted." *Molnar*, 229 F.3d at 600. Placing Plaintiff on the performance plan appears analogous to a negative evaluation or demotion. The mere fact that Plaintiff may have successfully completed the performance plan does not diminish the harm caused by improperly placing her on the plan in the first instance. In addition, placement on the performance plan, even if successfully completed, may have negatively affected her future with ACCO. As fact issues exist regarding whether or not the *Ellerth* defense even applies, the court will not further analyze whether the elements of the affirmative defense are satisfied except to note that fact issues surround this inquiry as well.

**B.    Retaliation**

To establish a prima facie case of retaliation, Plaintiff "must show that: (1) [s]he complained about conduct that is prohibited by Title VII; (2) [s]he suffered an adverse employment action; and (3) the adverse employment action was caused by [her] opposition to the unlawful employment practice." *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1086 (7th Cir. 2000). *See also Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009 (7th Cir. 2000) ("The prima facie [retaliation] case includes three elements: (1) that [the plaintiff] engaged in statutorily-protected expression by complaining about discrimination covered by Title VII; (2) that [the plaintiff] suffered an adverse job action; and (3) that there is a causal link between the protected expression and the adverse job action."). There is no dispute that Plaintiff complained about the alleged sexual harassment in writing prior to the November 20 meeting. As explained above, however, the parties dispute whether Plaintiff was fired from her job. In addition, "the timing of an employee's discharge may be circumstantial evidence of retaliatory motive. . . . However, in order to support an inference of retaliatory motive, the termination must have occurred fairly

14

soon after the employee's protected expression." *Paluck*, 221 F.3d at 1009-10 (citations and internal quotation marks omitted). Plaintiff alleges that she attempted to bring the sexual harassment to Stokes attention in August and September of 1997 and also complained to Fraser on October 31, 1997. However, the events leading up to the November 20 meeting, if true, evidence that Plaintiff twice mentioned, once in writing, *actually filing* sexual harassment charges within a week of her alleged discharge. Plaintiff claims she spoke with O'Neill about bringing sexual harassment charges on November 14, and Wesley admits that he read on November 18 her November 16 letter, in which she states that her husband was pressing her to bring legal action for sexual harassment, and that he discussed this letter with Stokes prior to the November 20 meeting. Hence, the alleged termination occurred "fairly soon after the employee's protected expression." *Id.* There is sufficient evidence to go to the jury on the issue of causation.

Defendants argue that even if Plaintiff were terminated, ACCO had a legitimate, non-discriminatory reason for her termination. *See Paluck*, 221 F.3d at 1009 (once a prima facie showing of retaliation has been made, if the defendant comes forward with a legitimate, non-retaliatory reason for the dismissal, the plaintiff must then rebut the defendant's "reason by demonstrating that it is a mere pretext for discrimination"). Specifically, Defendants argue that Plaintiff's outburst on November 7 and her use of profanity constituted insubordination and grounds for termination. Factual disputes that cannot be resolved on this motion surround the November 7 incident, and Plaintiff claims that the extent to which she used profanity was not enough to warrant her termination. Plaintiff, therefore, has shown that a material fact issue exists as to whether Defendants' allegedly legitimate, non-discriminatory reason for her termination was merely pretextual.

15

Because the court has determined that significant material fact issues exist and this case must be tried, the court will not reach Plaintiff's claims of breach of contract, intentional infliction of emotional distress, intentional interference with contract and prospective economic relationship, and battery.

## CONCLUSION

For the above-stated reasons, Defendants' motion for summary judgment is denied.

Date: January 11, 2001      Enter: _____
JOAN HUMPHREY LEFKOW
United States District Judge